J-S22009-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :     PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| HECTOR JULIUS TIRADO | : |
| | : |
| Appellant | : No. 2078 EDA 2025 |

Appeal from the Judgment of Sentence Entered November 25, 2024
In the Court of Common Pleas of Chester County
Criminal Division at No(s):  CP-15-CR-0000187-2023

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:              **FILED AUGUST 10, 2026**

Hector Julius Tirado appeals from the judgment of sentence entered by the Chester County Court of Common Pleas on November 25, 2024, after a jury convicted him of persons not to possess a firearm and carrying a firearm without a license.[1] On appeal, Tirado challenges the constitutionality of Sections 6105 and 6106. After careful review, we affirm.

The trial court accurately summarized the factual history underlying Tirado's convictions, based on the evidence presented at trial, as follows:

> On the evening of November 4, 2020, Detective Jonathan Shave of the Coatesville Police Department observed posts published on [Tirado]'s Snapchat account which depicted [Tirado] and another person holding firearms. Detective Shave used a separate cellphone to take a photo of the Snapchat posts and sent that photo to the two Coatesville City police officers working patrol that evening, Corporal (formerly Officer) Jared Davis and Officer

_____

[1] 18 Pa.C.S.A. §§ 6105(a)(1) and 6106(a)(1), respectively.

Michael Kinsman. Following the receipt of that photo, Corporal Davis responded to the area of a residence that he believed [Tirado] frequented. At that time, Corporal Davis observed a silver Lexus sedan that [Tirado] was known to operate or be involved with parked across the street from the residence. Corporal Davis took no further action at that time.

Around 12:30 am on November 5, 2020, Corporal Davis was still on patrol. While in his patrol vehicle on South 5th Avenue in Coatesville, Corporal Davis observed the silver Lexus parked on Olive Street. The scene struck Corporal Davis as out of the ordinary because the car engine was still running and was parked several feet from the curb with people standing outside of the vehicle. Corporal Davis also observed one of the car doors closing as if people were getting into the car. Corporal Davis was not able to identify the individuals he observed at that time.

Corporal Davis then pulled his patrol vehicle behind the Lexus. By that time, no one was outside of the vehicle anymore. Shortly after pulling his patrol vehicle behind the Lexus, the Lexus pulled out of the parked position and onto Olive Street. Corporal Davis decided to follow the Lexus and observed erratic driving at an accelerated speed before making a turn onto the very narrow and hilly Penrose Lane.

Corporal Davis, observing the vehicle continue to accelerate up Penrose Lane, activated his emergency lights to initiate a traffic stop. Due to the dark tinting on the windows of the Lexus, Corporal Davis could not see inside the vehicle as he approached. As such, he called for the occupants to lower the rear windows. When the windows were not lowered, Corporal Davis grew concerned for his safety and that of the occupants of the vehicle, and he backed away and returned to his patrol vehicle. Once inside the patrol vehicle, Corporal Davis used his PA system to command the occupants of the Lexus to lower the windows. The occupants eventually lowered the windows around the same time that Officer Michael Kinsman of Coatesville Police Department arrived. Officer Timothy Kemmerle of Coatesville Police Department and Officer Joe Juisti of East Pikeland Police Department also responded to the scene.

Once the windows were lowered, Corporal Davis approached the Lexus again and observed five people in the Lexus. [Tirado] was in the front passenger seat, [Tirado]'s girlfriend, Heashana

Williams. was in the driver's seat, and three other passengers were in the back seat. The Lexus was illuminated by the lights of Corporal Davis's patrol car, as well as his handheld flashlight. Corporal Davis noticed that the three passengers in the backseat of the Lexus appeared statuesque and did not acknowledge the presence of law enforcement. All of the passengers in the back seats appeared very nervous. In particular, the passenger in the middle rear seat caught his attention as his hands were covering his waistband and his knees were more together. [] Corporal Davis gathered identifying information from the Lexus occupants and returned to his patrol vehicle to run checks on the driver and passengers. Officer Kinsman stayed at the passenger side of the Lexus.

Corporal Davis asked Williams to exit the Lexus so he could speak with her and verify that she owned the Lexus. Corporal Davis made Williams aware that he had concerns based on his earlier observations of the Lexus at Olive Street. Williams' responses caused Corporal Davis to believe that Williams was being deceitful as her reasons for why they were on Olive Street and where they were going changed a couple of times within the few minutes she was speaking to Corporal Davis. Williams did not provide a satisfactory explanation regarding Corporal Davis's observations at Olive Street.

Following this conversation with Williams, Corporal Davis asked the rear passengers to exit the Lexus one at a time. The passenger in the middle rear seat, identified as Vincent Nemaungwe, tried to keep his legs pinned together as he exited the vehicle and was trying to keep his shirt over his waistband. Nemaungwe agreed to a pat down, during which Corporal Davis heard a significant metal clang from Nemaungwe's waistband making contact with the Lexus. At that point, a gun fell down Nemaungwe's pant leg. Corporal Davis handcuffed Nemaungwe and retrieved a silver .9mm Taurus from his pant leg. Corporal Davis secured the gun in his patrol car.

Upon further search of the Lexus, Corporal Davis located at .32-caliber black Beretta under the driver's seat as well as a loose .9mm round on the floor. Williams was detained and taken into custody as the Lexus was registered to her and she was the person driving. However, Corporal Davis suspected that, based on his observations at Olive Street, [Tirado] had been driving prior to the stop. To confirm his belief, Corporal Davis investigated street

camera footage from the area of 5th Avenue and Olive Street. Street camera footage showed [Tirado] driving the Lexus, and that just before Corporal Davis pulled in behind the Lexus on Olive Street, [Tirado] and Williams switched seats.

Further investigation revealed that [Tirado] did not have a valid license to carry a firearm under 18 Pa.C.S.A. § 6109, nor did he have a valid sportsman's firearm [permit] under 18 Pa.C.S.A. § 6106(c). The decision to charge [Tirado] was made based on the totality of the evidence, including the Snapchat postings, statements and observations from the stop and prior to it and the finding of the gun.

At trial, the parties stipulated that there was no dispute that [Tirado] was previously convicted of possession with intent to deliver a controlled substance, an ungraded felony. This stipulation was read to the jury after the jury found [Tirado] guilty of violating 18 Pa.C.S.A. § 6106 and before making a finding of guilt on the 18 Pa.C.S.A. § 6105 charge.

Trial Court Opinion, 12/8/25, at 2-5 (footnotes omitted).

On September 13, 2024, following a trial, a jury found Tirado guilty of persons not to possess a firearm and carrying a firearm without a license. On November 25, 2024, the court sentenced Tirado to an aggregate term of five and one-half to eleven years' imprisonment.

After his post-sentence and appeal rights were reinstated *nunc pro tunc*, Tirado filed a post-sentence motion on May 19, 2025, in which he requested a new trial. A hearing on this motion was held on June 30, 2025, at which Tirado raised, for the first time, a challenge to the constitutionality of the

- 4 -

statutes under which he was convicted. After oral argument, the court entered

an order denying Tirado relief. This appeal followed.[2]

_____

[2] "In those cases in which a petitioner under the [PCRA] has been granted leave to file a post-sentence motion or to appeal *nunc pro tunc*, the filing of the post-sentence motion or the notice of appeal must comply with the timing requirements contained in paragraph (A) of [Pa.R.Crim.P. 720]." Pa.R.Crim.P. 720, Comment; ***see also*** Pa.R.Crim.P. 720(A)(2) (stating that post-sentence motion shall be filed within 10 days after imposition of sentence; if defendant timely files post-sentence motion, notice of appeal shall be filed within 30 days of entry of order deciding motion or within 30 days of entry of order denying motion by operation of law); ***Commonwealth v. Mitchell***, 299 WDA 2023 (Pa. Super. filed Dec. 7, 2023) (unpublished memorandum) (explaining that when petitioner's post-sentence and appeal rights are reinstated, post-sentence motion must be filed within 10 days of order reinstating post-sentence rights and notice of appeal must be filed within 30 days of order reinstating appeal rights, or within 30 days of order denying post-sentence motions); ***see*** Pa.R.A.P. 126(b) (stating that we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

Here, on March 20, 2025, Tirado filed a PCRA petition requesting the reinstatement of his right to file post-sentence motions and a direct appeal *nunc pro tunc*. That same day, the PCRA court reinstated Tirado's post-sentence motion and direct appeal rights *nunc pro tunc*. The PCRA court order directed that Tirado "shall file any post-sentence motions within 21 days from the filing of all transcripts with the Chester County Clerk of Courts." On April 29, 2025, notes of testimony were filed by the Chester County Court Reporter. On May 19, 2025, counsel filed post-sentence motions. On June 30, 2025, post-sentence motions were denied. On July 29, 2025, counsel filed a notice of appeal from the judgment of sentence imposed on November 25, 2024.

While the instant appeal is facially untimely, we have declined to quash an appeal as untimely where a breakdown in court operations occurs whereby the court misinformed an appellant about the timing for filing a post-sentence motion. ***See Commonwealth v. Davis***, 321 A.3d 979, 134 MDA 2023, at **4 (Pa. Super. filed May 28, 2024) (unpublished memorandum) (declined to quash the appeal as untimely filed, finding the PCRA court's advice to defer filing of the post-sentence motions *nunc pro tunc* until after the PCRA court ruled on the remaining PCRA claims constituted a breakdown in court operations); ***see also Mitchell***, 299 WDA 2023, at *3 n. 5 (finding a
*(Footnote Continued Next Page)*

Tirado raises the following issues on appeal:

I. Should [Tirado]'s conviction for 18 Pa.C.S.A. § 6105(a) be vacated on the ground that [S]ection 6105(c)(2), as applied to [Tirado], violates the Second and Fourteenth Amendments and Article 1, Section 21?

II. Should [Tirado]'s conviction for 18 Pa.C.S.A. § 6106(a) be vacated on the ground that the statute, on its face and as applied to [Tirado], violates the Second and Fourteenth Amendments and Article 1, Section 21?

Appellant's Brief, at 2 (suggested answers omitted).

Tirado challenges the constitutionality of the statutes underlying his convictions. "The constitutionality of a criminal statute is a question of law for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Randolph***, 343 A.3d 1248, 1251 (Pa. Super. 2025) (internal quotation marks and citation omitted).

> [A] statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights. Further, a defendant may contest the constitutionality of a statute on its face or as-applied. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

_____

breakdown in court operations where the PCRA court misinformed appellant that he had 30 days to file a post-sentence motion *nunc pro tunc* and then granted an extension of time to file the post-sentence motion *nunc pro tunc* within 20 days of appellant receiving the notes of testimony). Accordingly, we decline to quash this appeal as untimely.

- 6 -

*Commonwealth v. Bradley*, 232 A.3d 747, 756 (Pa. Super. 2020) (citation omitted).

First, Tirado raises an as-applied challenge to the constitutionality of Section 6105(a)(1) based on the Second Amendment to the United States Constitution, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Tirado does not dispute that he is prohibited from possessing a firearm in accordance with Section 6105(c) based on his prior PWID conviction. **See** Appellant's Brief, at 9. Rather, he avers that his conviction under Section 6105(a)(1) is unconstitutional because the Second Amendment protects Tirado's conduct, *i.e.* possession of a firearm in a vehicle, and the Commonwealth failed to show that disarming him is consistent with this Nation's historical tradition of limiting the Second Amendment protection. **See** Appellant's Brief, at 21-22. Specifically, Tirado argues this nation has no historical tradition of disarming individuals who provide intoxicating substances to others. **See id.** at 23.

Tirado's challenge is premised upon **New York State Rifle & Pistol Association, Inc. v. Bruen**, 597 U.S. 1 (2022), in which the United States Supreme Court rejected the use of means-end scrutiny for reviewing the constitutionality of a statute alleged to violate the Second Amendment and instead promulgated the following standard:

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 597 U.S. at 24 (quotation marks and citation omitted). The Court further explained that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphases omitted).

As a preliminary matter, when faced with a Second Amendment challenge, we must determine whether the appellant is one of "the people" protected by the Second Amendment. *See Commonwealth v. Jenkins*, 328 A.3d 1076, 1085 (Pa. Super. 2024). Depending upon this determination, we next consider (1) whether the plain text of the Second Amendment covers the appellant's proposed course of conduct and (2) whether the Commonwealth met its burden of demonstrating that the regulation is consistent with our tradition of firearm regulation. *See id.* at 1087-88.

Following its decision in *Bruen*, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court considered a Second Amendment challenge to U.S.C. § 922(g)(8), which prohibits persons subject to a domestic violence restraining order from possessing firearms. The Court applied *Bruen* and

further clarified how lower courts should assess whether the government has met its burden of justifying the firearm regulation at issue by demonstrating its consistency with our history and tradition of firearm regulation:

> A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances. … As **Bruen** explained, a challenged regulation that does not precisely match its historical precursors still may be analogous enough to pass constitutional muster.
>
> *   *   *
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin.

**Rahimi**, 602 U.S. at 681, 692 (internal quotation marks and citations omitted). The **Rahimi** Court upheld the constitutionality of Section 922(g)(8), upon determining that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." **Rahimi**, 602 U.S. at 700, 144 S.Ct. 1889.

Considering the foregoing precedent, we turn to Tirado's as-applied challenge. Section 6105(a)(1) prohibits Tirado from possessing a firearm based on his prior felony PWID conviction. Because this Court has already

determined that convicted felons are encompassed within the term "the people" for Second Amendment purposes and that the Second Amendment's plain text covers the course of conduct prohibited by Section 6105, Tirado has satisfied the first step of the **Bruen** analysis. **See Randolph** 343 A.3d at 1256 ("[I]n the context of an as-applied challenge to § 6105, 'the people' encompasses all Americans, even criminals.") (citing **Commonwealth v. Farmer**, 329 A.3d 449, 455 (Pa. Super. 2024)).

Proceeding to the second prong of the **Bruen** analysis, we must consider whether the Commonwealth has satisfied its burden of demonstrating that Section 6105's prohibition on Tirado's right to bear arms is consistent with the nation's historical tradition of firearm regulation.

Tirado argues that under the **Bruen** framework, the Commonwealth failed to meet its burden to show that this Nation has a history and tradition of disarming an individual with a prior felony conviction for PWID. **See** Appellant's Brief, at 22. Specifically, Tirado argues there is no historical tradition for disarming individuals who deliver drugs. **See id.** at 23.

This Court's recent decision in **Randolph**, which addressed both a facial and as-applied Second Amendment challenge to Section 6105, is analogous to the case *sub judice*. Pursuant to the second step of the **Bruen** analysis, the **Randolph** panel considered the pertinent jurisprudence and determined that Section 6105's prohibition on the appellant's possession of a firearm was consistent with the nation's historical tradition of firearm regulation where the

trial court specifically found drug trafficking to be an inherently dangerous offense, and thus, appellant's prior PWID convictions placed him in a category of persons who pose a credible threat to others. *See Randolph*, 343 A.3d at 1258. The panel concluded that "America's history of prohibiting certain classes of people from having firearms, particularly those that could pose a higher risk of danger to society, provides a historical analogue required by *Bruen* for § 6105, even if it is not a historical twin." *Id.* at 1259 (internal quotation marks and citation omitted). Therefore, because Section 6105's prohibition on the right to bear arms was supported by adequate historical analogues, the panel determined that the appellant's as-applied challenge to the constitutionality of the statute failed under *Bruen*. *See id.*

Tirado acknowledges *Randolph* as precedent, but conveniently does not fully address *Randolph* in his analysis of how the applicable case law applies to his case. Instead, Tirado's argument focuses solely on distinguishing his case from *Rahimi*. Specifically, Tirado acknowledges that, under *Rahimi*, individuals who present a credible threat to the physical safety of others may be constitutionally disarmed. However, he contends that *Rahimi* is distinguishable because Section 922(g)(8), the statute at issue in *Rahimi*, criminalizes the possession of a firearm by a person with a present intent to terrorize whereas Section 6105 punishes the simple possession of a firearm based upon the existence of a prior conviction. *See* Appellant's Brief, at 26;

*see also id.* at 27 (arguing that "section 6105(c)(2) impermissibly punishes a person **simply** for prior drug conviction." (emphasis added)).

Similar to *Randolph*, we find that the Commonwealth has met its burden here. The Commonwealth presented evidence of a historical tradition of prohibiting individuals who pose a credible threat of violence, such as those convicted of drug trafficking, from possessing firearms, which this Court previously determined to be an adequate historical analogue for purposes of upholding the constitutionality of Section 6105 under *Bruen*. *See Randolph*, 343 A.3d at 1259. Moreover, in *Randolph*, we explicitly rejected the arguments Tirado raises in his brief:

> In reaching this decision, we necessarily conclude that [a]ppellant's arguments to the contrary are unpersuasive. Although he devotes a significant portion of his brief to describing that PWID is not a "crime of violence," that contention is unavailing since "crime of violence" is not the term utilized by the U.S. Supreme Court throughout its recent case law. Instead, the *Rahimi* Court highlighted that firearm prohibitions may apply to those that pose a credible threat to the safety of another. Drug traffickers fit that mold.
>
> Next, although [a]ppellant is correct that there is no identical provision from the founding era restricting drug traffickers from having firearms, likely arising from the lack of existence of this crime in that era, that does not entitle him to relief. It is clear that historical analogues are close enough to show that § 6105 has a historically rooted how and why of restricting firearm possession. No "dead ringer" is required. *See Bruen*, 597 U.S. at 26 ....
>
> Finally, [] the ban imposed pursuant to § 6105 is not permanent because Pennsylvania law permits restoration of gun rights in certain circumstances. *See, e.g.*, 18 Pa.C.S.[A.] § 6105(d) (allowing for application to the court of common pleas for relief from the disability imposed by this section); *see also* 18 Pa.C.S.[A.] § 6105.1 (outlining procedure for restoration of

- 12 -

firearms rights restricted by § 6105). Section 6105 is then, in that sense, less restrictive than some of the historical laws that permanently disarmed individuals without any conviction simply because they belonged to a certain class.

*Id.* (some quotation marks omitted). Based on the thoughtful analysis above, we are not persuaded by Tirado's attempts to diminish the seriousness of the offense he was convicted of by defining it as "simply" a prior drug conviction.

Therefore, in light of our decision in **Randolph**, Tirado, who was previously convicted of PWID, may be constitutionally disarmed under Section 6105 in accordance with the Second Amendment. Accordingly, Tirado's as-applied challenge to Section 6105 fails.

In his second and final issue, Tirado raises a challenge to the constitutionality of Section 6106, which requires a person to possess a concealed carry permit in order to carry a firearm in a vehicle.

In upholding the constitutionality of Section 6106 under the Second Amendment post-**Bruen**, we have explained that statutes requiring "a person to obtain a license to carry a firearm [] do not violate the Second Amendment where the statute does not require the applicant to show any special need and requires the government to issue the license unless the applicant fails a background check." **Commonwealth v. Mead**, 326 A.3d 1006, 1015 (Pa. Super. 2024) (citations omitted). Accordingly, we have held that, because Pennsylvania's shall-issue firearm licensing statute does not violate the Second Amendment under **Bruen**, Section 6106 is likewise constitutional, and

an "[a]ppellant's conviction for carrying a firearm without a license does not violate his federal constitutional rights." ***Id.***

More recently, in ***Commonwealth v. Williams***, 341 A.3d 144 (Pa. Super. 2025), a panel of this Court specifically considered the constitutionality of Section 6106's limitation on the right to carry a firearm in a vehicle. In doing so, the panel analyzed our nation's historical tradition of regulating the concealed carrying of firearms on one's person and noted that it considered "the possession of a firearm in a vehicle, as opposed to on one's person, nearly indistinguishable." ***Williams***, 341 A.3d at 158 n. 25. The panel addressed the appellant's arguments as follows:

> While Williams makes a compelling case that our historical tradition is rather quiet on the question of carrying firearms in the available forms of transportation in the 19th century, we do not need a regulation of that sort to find section 6106 constitutional. ***See Bruen***, 597 U.S. at 3 … (stating courts need not find "dead ringer" to hold law constitutional). This reasoning follows a "use it or lose it view of legislative authority"—it assumes that late-18th and early-19th century legislatures constitutionally could not have legislated in this fashion merely because they did not. ***See Rahimi***, 602 U.S. at 739–40 … (Barrett, J., concurring) (internal quotation omitted). This rationale, however, is flawed and forces upon [present-day] legislatures a law trapped in amber. Such an approach would turn any Second Amendment analysis into a historical inquiry so exacting as to be useless, a too-sensitive alarm that sounds whenever a regulation did not exist in an essentially identical form at the founding.
>
> Instead, this Court need only, and does, consider section 6106 relevantly similar to the many public-carry restrictions which proliferated after the ratification of the Second Amendment in 1791. ***See Bruen***, 597 U.S. at 50 …. Carrying a weapon concealed on one's person versus storing it in the glovebox or center console is, to this Court, a distinction without a difference. If anything, the additional number of spaces in which to store a firearm within a

vehicle, the variety of firearms that can be carried within a vehicle as opposed to concealed on one's person, and the portability provided by modern vehicles all weigh in favor of section 6106 applying with greater force to possession within a vehicle than possession on one's person.

*Id.* (some quotation marks, some citations, and brackets omitted). The panel concluded that because "section 6106 can then be viewed through the same lens as a standard licensing scheme for concealed carry, **Bruen** is controlling, and section 6106's prohibition on unlicensed individuals possessing a firearm in a vehicle is similarly constitutional." *Id.* (citation omitted). Therefore, this Court's decision in **Williams** is dipositive, and Tirado's facial challenge to the constitutionality of Section 6106 under the Second Amendment fails.

We acknowledge that Tirado asserts that the **Williams** Court erred by finding the vehicle provision in Section 6106 to be analogous to the concealed carry provision and points us instead to **Suarez v. Paris**, 741 F.Supp.3d 237 (M.D. Pa. 2024), in which the United States District Court for the Middle District of Pennsylvania addressed a constitutional challenge to Section 6106(a) but reached the opposite conclusion of the **Williams** court.

However, **Williams** is binding precedent and this panel "lacks the authority to overturn another panel decision." **Commonwealth v. May**, 271 A.3d 475, 482 (Pa. Super. 2022) (citation omitted). While **Williams** is binding on this panel, federal court decisions, other than those of the United States Supreme Court, are not. **See Commonwealth v. Randolph**, 343 A.3d 1248, 1256 n.4 (Pa. Super. 2025) ("[I]t is beyond the power of a Superior Court

panel to overrule a prior decision of the Superior Court, except in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court." (citation omitted)); *see also Williams*, 341 A.3d at 156.

For the foregoing reasons, Tirado is not entitled to his requested relief, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/10/2026